FILED
2007 Jul-23  AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **EUGENE A. KILPATRICK,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:06-CV-1529-RDP** |
| | } | |
| **TYSON FOODS, INC., d/b/a TYSON FARMS, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

## I.     INTRODUCTION

This case is before the court on Defendant Tyson Foods Inc.'s ("Defendant" or "Tyson") Motion for Summary Judgment (Doc. # 14) filed on April 20, 2007.  The motion is now under submission and ripe for disposition.  For the reasons set forth below, the court finds that there are no genuine issues of material fact and that Defendant is entitled to judgment as a matter of law. Therefore, the motion is due to be granted.

## II.    STATEMENT OF FACTS

### A.     Tyson Feed Mill Overview

Tyson contracts with area farmers, or "growers" to raise chickens that are then shipped to its various production facilities throughout the state.  (Doc. # 19 Ex. D ¶ 3).  Tyson feed mills, including the Albertville Feed Mill, produce chicken feed that is then distributed directly to the grower.  (*Id.*). Various types of feed are utilized to feed various types of chickens, and Tyson scientists determine exactly what kind of feed a specific type of chicken needs on each day of its lifespan.  (*Id.*; Doc. # 17 Ex. A at 38).  The feed mills are responsible for delivering feed, and ensuring that growers have

the correct type and amount of feed needed for the specific age and type of birds.  (Doc. # 19 Ex. D ¶ 3).  Tyson growers are customers of its feed mills, and they could opt to grow for Tyson's competitors if they believe that they are not being provided adequate service by Tyson.  (*Id.*; Doc. # 17 Ex. A p. 40).  Accordingly, it is important for Tyson feed mills to provide good customer service to its growers, and complaints from growers are taken seriously by Tyson management.  (Doc. # 19 Ex. D ¶ 3; Doc. # 17 Ex. A p. 40)

### B.    Albertville Feed Mill

Each feed mill in Alabama is located within a specific complex, made up of other Tyson facilities in the area.  (Doc. # 19 Ex. D ¶ 2).   At the Albertville Feed Mill, the Feed Mill Manager oversees all operations at the feed mill.  (*Id.*).  The Feed Mill Manager reports to the Live Production Manager who is responsible for also supervising other facilities within the complex.  (*Id.*).

### C.    Dispatcher Position

The Albertville Feed Mill employs a feed dispatcher who ensures that the correct type and amount of feed is delivered to growers on the day when it is needed.  (*Id.* ¶ 9).  Plaintiff held this position at the Albertville Feed Mill for over twenty-seven years.  (Doc. # 18 Ex. B Attach. 3).  There is no formal job description for the position of dispatcher, as the Albertville Feed Mill is Tyson's only local feed mill that employs a dispatcher, and the job responsibilities for the position of dispatcher at the Albertville mill are performed by several other people holding various positions at the other feed mills.  (Doc. # 18 Ex. B Attach. 1).  The Albertville Feed Mill dispatcher is responsible for: (1) overseeing the feed delivery process, which may include utilizing a computer program (known as a Feed Order & Delivery program) to project the amount and type of feed that will need to be delivered to each grower, as well as when Tyson should deliver it; (2) supervising

2

truck drivers; (3) monitoring any Department of Transportation violations by truck drivers; (4) ensuring feed samples are collected for analysis at Tyson corporate headquarters; and (5) supervising the cleaning of the truck loading area.  (Doc. # 18 Ex. B pp. 107–108; Doc. # 19 Ex. D ¶ 9).

### D.    FOD Projection System

In order to project the amount and type of feed each grower needs, future feed consumption of each grower, and the estimated date feed is needed by each grower, Tyson uses a computer software system known as the Feed Order & Delivery ("FOD") program.  (Doc. # 18 Ex. B at 163–68, 185–88; Doc. # 19 Ex. D ¶ 5).  The FOD program generates feed projections based on information which is input into the system.  (Doc. # 17 Ex. A at 49; Doc. # 18 Ex. B at 61, 157). This information includes data regarding the amount of feed each grower received from the previous delivery, as well as data concerning feed the inventories of the growers.  (*Id.*).  Both of these data sources are entered into the FOD by the feed dispatcher.  (*Id.*).  At the Albertville Feed Mill, the feed dispatcher is also responsible for correcting any feed posting errors in FOD. (Doc. # 18 Ex. B at 61, 67).

Once FOD generates this date projection for feed delivery, the feed dispatcher then schedules the delivery or "set(s) the load up," by making sure the correct type of feed is assigned, inputting the load increment, and then confirming the load in the system.  (Doc. # 18 Ex. B at 107–108, 157–59, 163–68, 189).  At the Albertville Feed Mill, either on the date of the needed delivery or days before, the feed dispatcher prints a delivery ticket that provides instructions to the driver regarding the amount and type of feed to be hauled to a particular grower, and he also assigns the ticket to a driver to haul the feed.  (*Id.* at 88, 94; Doc. # 22 Ex. M).

### E.    Feed Loading Process

Once the feed load is determined and assigned to a driver, the truck is loaded at the Albertville Feed Mill through a gravity based system.  (Doc. # 17 Ex. A at 56–57).  To make the load, the driver drives the truck onto the scale and walks up a set of steps to a catwalk which is located above the truck.  (Doc. # 19 Ex. D ¶ 6).  The driver zeroes out the scale, and then pulls a lever to open the feed bin, under which the truck is positioned, and the feed is loaded onto the truck by gravity.  (Doc. # 17 Ex. A at 57–58).  The driver obtains a final weight from the scale that is recorded on the feed ticket, and then delivers the feed to the grower.  (*Id.* at 58).  At the Albertville mill, once the feed is delivered, the driver returns a copy of the feed ticket to the feed dispatcher, and the feed dispatcher uses this ticket to input delivery data into FOD.  (*Id.* at 59).[1]  That data is in turn used to generate future projections for the grower.  (*Id.*).  While the feed dispatcher is responsible for supervising the feed loading process at the Albertville Feed Mill, he is not required to be present at the loading station when drivers are loading trucks; however, generally he must be present on a frequent basis.  (*Id.* at 344–45, 362, 408–409).

### F.    Relevant Tyson Employment Policies

Tyson maintains a corrective action plan under its Rules of Conduct which provides certain work rules for employees and discipline if those rules are violated.  (Doc. # 19 Ex. D ¶ 7).  Under

---

[1]Other Tyson feed mills in the surrounding area, namely Ivalee and Talladega, use a different method to load feed onto trucks, which is fully automated.  (Doc. # 17 Ex. A at 64).  These mills employ a "loader/unloader" who sits in a monitoring station and uses a computerized system to automatically load trucks.  (Doc. # 19 Ex. D ¶ 6).  The truck driver drives the truck onto the scale, receives a printed ticket, and then brings the feed ticket to the loader.  (*Id.*).  The loader inputs data from the feed ticket into a computer and the automated load system then directs the correct type and amount of feed to each bin on the truck.  (*Id.*).  After delivering the feed, the driver returns a copy of the ticket to the loader.  (Doc. # 17 Ex. A at 359–63).

the Rules of Conduct, employees may be issued both verbal and written warnings. (*Id.*). A serious counseling statement is issued to employees when they commit a serious offense, or repeatedly engage in patterns of unacceptable behavior. (*Id.*). Tyson also has written policies prohibiting discrimination, retaliation, and harassment on the basis of race, color, religion, sex, national origin, age, disability, or other protected status. (*Id.* ¶ 8; Doc. # 17 Ex. A Exs. 4, 6 & 7). Tyson's employees receive training with respect to its policies. (*Id.*).

### G.   Plaintiff's Employment With Tyson

Plaintiff began his employment at the Albertville Feed Mill on January 1, 1979, but began employment with the previous company that operated at the mill site, McElrath, on May 9, 1972. (Doc. # 17 Ex. A at 26–28, Exs. 8 & 9).[2] Tyson bought the Albertville Feed Mill in the 1990s, and retained Plaintiff as the feed mill dispatcher. (*Id.* at 27, 32). During the entirety of his employment at Tyson, Plaintiff worked as the Albertville Feed Mill Dispatcher and was responsible for supervising the feed delivery process there. (*Id.* at 32–34; Doc. # 19 Ex. D ¶ 9). Plaintiff alleges that he acquired more job responsibilities when ownership of the mill transferred to Tyson without receiving a promotion and/or a pay raise. (Doc. # 17 Ex. A at 342). Plaintiff complains that Tyson consistently expected him to work overtime without pay, be "on call" at all times, and be responsible for all aspects of feed delivery. (*Id.* at 135–45, 341–43; Doc. # 18 Ex. B at 105–108, 125–26, 131–32, 165–67, Ex. 2, Ex. 3; Doc. # 22 Ex. J at 33, 38–39, 52–53, 55–57, 60–61, 67, 74–75, 78–79).

---

[2]McElrath was intermediately purchased by another company, Hudson, before Tyson began its operations and Plaintiff also worked for Hudson. (*Id.*).

In the years leading up to Plaintiff's termination, he experienced performance problems and received written warnings concerning these problems; nevertheless, his overall rating during that period was "Good Performer." (*Id.* at 89–91, Exs. 8, 9, 10 & 11; Doc. # 22 Ex. A). In 2003, Plaintiff received written warnings for failing to properly supervise truck drivers (the drivers were spilling feed on the load-out scales), as well as failing to prevent drivers from exceeding the allowable driving hours required under the DOT regulations. (Doc. # 17 Ex. A Exs. 10 & 11). In October 2004, Plaintiff received a performance review from Charles Dowell ("Dowell"), the Albertville Feed Mill Manager at that time. (Doc. # 17 Ex. A at 105–106, Ex. 14; Doc. # 22 Ex. A). The review instructed Plaintiff to "take more initiative in improving the feed delivery system." (*Id.*). Despite that feedback, Dowell rated Plaintiff overall as a "Good Performer." (*Id.*). Plaintiff understood that Dowell thought that there was "always room for improvement" in the feed delivery system at the Albertville Feed Mill, and, specifically that Dowell thought Plaintiff needed to improve the equalization of driver loads.[3] (Doc. # 17 Ex. A at 106, 354–57).

---

[3]As dispatcher for Tyson, Plaintiff assigned loads to truck drivers. (Doc. # 18 Ex. B at 94). This differed from when Plaintiff previously worked for McElrath and Hudson—then, drivers were paid by the hour, and driver load equalization was not part of his job. (Doc. # 17 Ex. A at 387–88). Tyson's drivers are paid primarily by the tonnage of each load. (Doc. # 19 Ex. D ¶ 10). It was Plaintiff's responsibility to assign loads as equally as possible to ensure the drivers were treated impartially and their pay was equalized. (*Id.*). Specifically, drivers primarily ran three different types of loads—short loads, long loads, and mid loads—and the type of load is based on the number of miles to be driven for its delivery. (*Id.*). Typically, drivers prefer the short loads because drivers can haul more feed, and therefore receive more pay, or long loads because they receive additional compensation for mileage for those types of loads. (*Id.*). In contrast, drivers generally do not like midloads because they are usually not as profitable, as they cannot haul as much feed in a day and do not receive additional compensation for mileage. (*Id.*). Because of these differences, and the effect it would have on drivers' pay, equalizing the assignments of driver loads was an important task. (*Id.*). Plaintiff notes that he did not receive a pay raise or promotion when this duty was added by Tyson. (Doc. # 17 Ex. A at 387–88).

In March 2005, Tyson undertook a restructuring and Keith Martin ("Martin"), the Live Production Manager for the Oxford Complex, assumed the responsibility of supervising the Ivalee, Talladega, and Albertville Feed Mills.[4]  (Doc. # 18 Ex. B at 42).  In March 2005, the Albertville mill was experiencing feed outages, which is when growers run out of feed for their flocks.  (Doc. # 17 Ex. A at 129, Ex. 17).  Plaintiff insists that these outages were commonplace, impossible to predict, caused by various factors, and that this particular shortage, which occurred over a weekend, was caused by driver absence and mill facility problems.  (*Id.* at 243–44, 342–43, 355–57, 377–80, Ex. 17).  Also around this time, Keith Martin documented that FOD was not being used for projections at the Albertville Feed Mill.  (*Id.* at Ex. 17).  Martin discussed these issues with Plaintiff and spent close to a month working with Plaintiff to train him to use FOD to generate feed projections.  (*Id.* at 129–30).  During this same time, Chad Wiggs,[5] Broiler Manager, was also receiving reports from growers of feed outages.  (*Id.* at 124).

In April 2005, Dowell again reviewed Plaintiff's performance and rated him a "Developable Performer," the second to lowest rating.  (*Id.* at 107, 109, Ex. 15).  Dowell discussed with Plaintiff his performance problems including his routine failure to timely complete paperwork, his need to improve communication skills, his need to improve organization in feed delivery, and his need to

---

[4]Prior to this restructuring, Martin supervised only the Talladega Feed Mill.  (Doc. # 18 Ex. B at 43).

[5]As Broiler Manager, Chad Wiggs is responsible for supervising the service technicians ("service techs") at the broiler farms. (Doc. # 17 Ex. A at 120).  The service techs support the growers' farms, including maintenance and dealing with any issues a grower might have with feed or delivery.  (Doc. # 19 Ex. D ¶ 4).  Service techs assume responsibility for estimating the amount of feed particular farms need when the birds reach a certain age, and communicating with the feed mill dispatcher regarding feed and delivery to farms.  (*Id.*).  During Plaintiff's employment, the age at which the service techs assume responsibility for estimating feed amounts for birds changed from 38 to 42 days old.  (*Id.* at 180–81, Ex. 25).

increase his knowledge of FOD.  (*Id.* at 113–18).  Plaintiff was also directed to "create a plan for

improving his supervisory skills and people skills," as well as a timeline for accomplishment those

tasks, and was required to submit the plan by June 1, 2005.  (*Id.* at Ex. 15).  Plaintiff never submitted

the required action plan.  (*Id.* at 119).

In August 2005, service techs were calling in feed orders that were not being delivered by

the Albertville Feed Mill, and this was causing outages.  (*Id.* at 131–32; Doc. # 18 Ex. B at 147–51,

192–95, Exs. 11 & 12; Doc. # 22 Exs. K & L).  Plaintiff asserts these problems were due in part to

debris in the feed, milling problems, and miscommunication between the service techs and the mill.

Plaintiff received an email documenting this problem and understood Wiggs was displeased with

the customer service the growers were receiving from Plaintiff and the Albertville Feed Mill.  (Doc.

# 17 Ex. A at 131, 134, Ex. 18).  Around this same time, Dowell spoke with Plaintiff about the

requirement (mandated by the corporate office) that Plaintiff take the feed samples, but Plaintiff

failed to consistently perform that duty.  (*Id.* at 178–79; Doc. # 18 Ex. B at Ex. 10).  Plaintiff's

performance problems continued, and on November 28, 2005, Plaintiff received a verbal warning

for failure to use FOD to forecast and project feed deliveries and failure to equalize driver loads.

(Doc. # 17 Ex. A at 135, 158–59, Ex. 20).  In an attempt to correct feed delivery issues at the

Albertville mill, Dowell sent Plaintiff to Tyson's Ivalee Feed Mill to observe and receive further

training on the FOD.  (*Id.* at 135).  However, Plaintiff failed to utilize FOD any differently, even

after observing and training at the Ivalee Mill.  (*Id.* at 142).

In December 2005, Plaintiff received a call on a Friday from a grower who told Plaintiff he

would not have enough feed to last through the weekend.  (*Id.* at 148–49, Ex. 19).  According to

Plaintiff, this was due to unequal feed distribution among the grower's houses by the driver of the

last delivery to the grower.  (*Id.* at 154–55; Doc. # 18 Ex. B at 202–206; Doc. # 22 Exs. K & L).

Plaintiff told the grower to call back on Sunday and leave a message if he was going to run out of

feed as Plaintiff had already scheduled a feed delivery to the grower for Sunday.  (Doc. # 17 Ex. A

at 149–50).  The grower ran out of feed on Saturday morning (as he indicated he had expected), and

a service tech contacted Plaintiff to let him know the grower was out of feed.  (*Id.* at 149–51).

However, Plaintiff did not get feed delivered to the grower, and the service tech had to contact the

mill management directly to arrange the delivery of feed.  (*Id.* at 151–52, Ex. 19).

On January 6, 2006, Plaintiff was issued a serious counseling statement regarding his failure

to take the necessary steps to implement the delivery planning system and equalize driver loads, and

Plaintiff understood there had been driver complaints and management concerns about his

performance.  (*Id.* at 158–59, Ex. 20).  Plaintiff was instructed at that time that his poor performance

could not continue and he was suspended without pay.  (*Id.* at 161–62, Ex. 20).  Plaintiff understood

at that time that Tyson had serious concerns about his work performance.  (*Id.* at 162–63).  Indeed,

he was concerned about being terminated.  (*Id.*).

In April 2006, Michael Pearce ("Pearce") replaced Dowell and began working as the

Albertville Feed Mill Manager.  (Doc. # 19 Ex. C at 7, 13, 32).  Prior to working for Tyson as a feed

mill manager, Pearce worked for ConAgra as a feed mill superintendent and had fifteen years

experience in distribution.[6]  (*Id.* at 7, 51).  On his first full day on the job, Pearce noticed that

Plaintiff had not pulled the required feed samples for the week.  (*Id.* at 37, 80).  On Sunday, April

9, 2006, Pearce was working at the mill over the weekend because the mill was out of corn, an

---

[6]Plaintiff notes that ConAgra raised turkeys and the FOD system there was dissimilar to that used at the Albertville mill.  (Doc. # 19 Ex. C at 50).

ingredient used to make the feed, and he was trying to find a way to get the corn and ensure that feed loads were hauled. (*Id.* at 55). That night, Pearce called Plaintiff and requested that he call the day shift drivers to ask some of them not to report to work due to the feed shortage, so that they could conserve driving hours under the DOT regulations and utilize their hours later in the week. (*Id.* at 56–61). Plaintiff responded that because Pearce was already at the mill, Pearce should call the drivers. (*Id.* at 63). Drivers also continued to complain to Pearce about the way Plaintiff was inequitably assigning loads. (Doc. # 17 Ex. A at 191, 206; Doc. # 19 Ex. C at 66–68).

During this same time, a driver received a write-up arising from a DOT inspection and brought the paperwork to Plaintiff, his supervisor. (Doc. # 17 Ex. A at 198–99; Doc. # 19 Ex. C at 82). It was Plaintiff's responsibility, as the direct supervisor of the drivers at the Albertville Feed Mill, to inform mill management of any DOT issues so that they could be addressed in a proper and timely manner. (Doc. # 19 Ex. D ¶ 11). However, Plaintiff did not take the DOT paperwork to mill management, and Pearce did not receive the paperwork until the last day allowed for Tyson to respond to the violation. (*Id.*; Doc. # 19 Ex. C at 83). On April 12, 2006, Plaintiff attended the day shift safety meeting with the drivers, but did not attend the night shift meeting because of a revival at his church; however, attending such meetings was part of his responsibility as supervisor of the drivers and Plaintiff admits he did not discuss his absence with Pearce in advance. (Doc. # 17 Ex. A at 201–203; Doc. # 19 Ex. D ¶ 11). Also during this time, Pearce sent Plaintiff an email instructing him to meet with a driver who received a DOT violation and develop a written response regarding the problem. (Doc. # 17 Ex. A at 205–207; Doc. # 19 Ex. C at 98, Ex. 26). Plaintiff admits that he failed to respond to Pearce's email at all and did not follow Pearce's directive. (Doc.

# 17 Ex. A at 207–208).  Plaintiff also failed to respond in any manner to another email from Pearce regarding changes in feed types.  (*Id.* at 211–14).

On April 24, 2006, Plaintiff was issued a Serious Counseling statement detailing some of the performance problems Plaintiff continued to exhibit and the topics that had been discussed with Plaintiff since April 4, 2006 regarding his job performance.  (*Id.* at 215–16, Ex. 28).  The serious counseling statement covered Plaintiff's failure to equalize driver loads, Plaintiff's failure to accurately recount to Pearce how many loads were left for the day, and his failure to respond to requests from Pearce; it also addressed issues previously covered with Plaintiff including his failure to gather feed samples, failure to implement FOD, continued errors in projections, and failure to utilize drivers to achieve maximum delivery hours.  (*Id.* at 216–17, 227–36).  Upon receiving this second serious counseling statement in a twelve month period, Plaintiff was suspended without pay and instructed to return to the Albertville Feed Mill on May 3, 2006, with a written action plan designed to address and resolve his continued performance issues outlined in the serious counseling statement.  (*Id.* at 239–40, 250–53, Ex. 28).  Plaintiff refused to sign the serious counseling statement, believing that the real reason for his discipline was discriminatory age bias by Martin and Pearce.  (*Id.* at 252–53, 266–68, 395–412).  Plaintiff returned to the mill on May 3, 2006 with his attorney and left his proposed action plan with Pearce.  (*Id.* at 263–64).  In his proposed action plan, Plaintiff did not accept responsibility for any of his performance failures, and did not even provide one action item that he planned to take in order to improve his performance.  (*Id.* at 257, Ex. 30).  Instead, Plaintiff's proposed solution was for Tyson to hire additional personnel to perform his job duties, and to automate the entire feed loading system similar to the Ivalee mill.  (*Id.* at 255).

Tyson terminated Plaintiff's employment on May 8, 2006, citing Plaintiff's "numerous failure[s] to respond to management. Failure to implement delivery planning." (*Id.* at 265–66, Ex. 31; Doc. # 18 Ex. B at 258). Martin noted that Plaintiff was terminated based on additional reasons, including his failure to "consistently utilize the projection function of FOD," failure to "supervise and organize his department and his drivers in an efficient manner," and failure to "respond to the requests of his supervisor to perform specific functions or take care of specific responsibilities." (Doc. # 18 Ex. B at 153–54). Plaintiff was 68 years old at the time of his termination. (Doc. # 22 Ex. H). After Plaintiff's termination, Anthony Dalrymple ("Dalrymple"), a long time employee of the Albertville feed mill who was 52 years old at the time, replaced Plaintiff as feed dispatcher at the Albertville Feed Mill. (Doc. # 18 Ex. B at 312–14; Doc. # 19 Ex. D at Ex. A). Currently, Dalrymple's responsibilities as the Albertville Feed Mill Dispatcher are the same as Plaintiff's, and he is able to perform these responsibilities without the additional resources Plaintiff requested in his written action plan, with the possible exception of additional drivers. (Doc. # 18 Ex. B at 76).

Plaintiff complains Tyson management was quick to blame him for all problems with the feed delivery system, despite the fact that outages and other problems can be caused by various factors unrelated to his work, the other mills experienced similar outages, and it is impossible to determine a singular cause. (*Id.* at 135–45, 341–43; Doc. # 18 Ex. B at 105–108, 125–26, 131–32, 165–67, Ex. 2, Ex. 3; Doc. # 22 Ex. J at 33, 38–39, 52–53, 55–57, 60–61, 67, 74–75, 78–79). He also points out that "he was the only person Tyson ever terminated as a result of outages." (Doc. # 22 at 27, Exs. E, G, H & I). Plaintiff similarly denies responsibility for failing to send in feed samples and alleges that Martin knew it was not his responsibility. (Doc. # 18 Ex. B at 145–46). Finally, Plaintiff complains that even though he was expected to both "handle everything related to

12

feed delivery" and "supervis[e] drivers in every aspect of their job," he did both effectively and appropriately equalized driver loads. (Doc. # 18 Ex. B at 52–97, Ex. 2 & 3; Doc. # 19 Ex. D at 39–100; Doc. # 19 Ex. E; Doc. # 22 Exs. C & D). Plaintiff believes that Pearce and Martin discriminated against him because of his age, and that none of his "performance problems" were problems at all until Pearce replaced Dowell and found nine "problems" with Plaintiff's job performance in his first ten days at Tyson, which were never verified by Martin, but were later the grounds cited for his termination. (Doc. # 17 Ex. A at 267–68; Doc. # 18 Ex. B at 154–55, 289–98; Doc. # 19 Ex. C at 77, 80, 91–92, Ex. 30). However, Plaintiff admits that he never heard anyone, including Martin and Pearce, make any derogatory remarks about Plaintiff's age, or people in Plaintiff's age group generally, or any other statements that would indicate age-based animus. (Doc. # 17 Ex. A at 268–69).

Plaintiff also cites the following statistics as grounds for a finding of discrimination: (1) fourteen of the thirty-five people who terminated from the Albertville mill from 2001 to 2006 were forty years of age or over; (2) in 2001, five of the eighteen people who terminated from the three mills, Ivalee, Talladega, and Albertville, were forty years of age or over; (3) in 2002, thirteen of the twenty-four people who terminated from the three mills were forty years of age or over; (4) in 2003, seven of the nineteen people who terminated from the three mills were forty years of age or over; (5) in 2004, eight of the sixteen people who terminated from the three mills were forty years of age or over; (6) in 2005, twelve of the thirty-one people who terminated from the three mills were forty years of age or over; (7) in 2006, seventeen of the forty-five people who terminated from the three mills were forty years of age or over; (8) in 2005, two of the six people at the three mills who received Written Warning/Suspension and/or Counseling Statements were forty years of age or over;

and (9) in 2006, thirteen of the twenty people at the three mills who received Written Warning/Suspension and/or Counseling Statements were forty years of age or over.  (Doc. # 22 Exs. G, H & I).  Defendant notes that these numbers include both voluntary (*i.e.*, retirements and/or resignations) and involuntary terminations.  (Doc. # 18 Ex. B at 251–53).

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at  248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The method used by the party moving for summary judgment to discharge its initial burden on the motion depends on whether that party bears the burden of proof on the issue at trial.  *See*

*Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more   than a simple statement that the non-moving party cannot meet its burden at trial.  But it does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115–16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on

the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest

on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343,

358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    ANALYSIS

Plaintiff alleges that Defendant discriminated against him in violation of the Age

Discrimination in Employment Act of 1967 ("ADEA"), by terminating his employment.  The ADEA

provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual with respect to his [or her] compensation,

terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §

623(a)(1).  In order to fall under the ADEA's protections, an employee must be "at least 40 years of

age."  29 U.S.C. § 631(a).

There are three methods by which a plaintiff may establish a *prima facie* case of age

discrimination:  (1) by direct evidence of discriminatory intent; (2) by meeting the test originally set

out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) which has been

appropriately modified to use in age discrimination cases; or (3) by statistical proof of a pattern of

discrimination.  *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989); *Young v. Gen. Foods*

*Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989); *Buckley v. Hosp.*

*Corp. of Am., Inc.*, 758 F.2d 1525, 1529 (11th Cir. 1985).  Although Plaintiff insists that he has

produced direct evidence of age discrimination, the court disagrees and finds this evidence deficient.

Similarly, although Plaintiff has established a *prima facie* case of age discrimination, this is legally

insufficient in light of Defendant's proffered legitimate reason for his termination—poor job

performance—to prove age discrimination.  That is,  Plaintiff is unable to establish that Defendant's

16

reasons for terminating his employment were pretextual nor can he show that Defendant otherwise intentionally discriminated against him based upon his age.  Finally, although Plaintiff offers some statistics as evidence of a discriminatory pattern, the court finds that he has failed to establish an analytical framework in which to analyze this evidence.

### A.        Plaintiff Has Not Produced Direct Evidence of Age Discrimination

Plaintiff's initial argument is that Martin's alleged "persistent yet unfounded belief that every problem at the mill regardless of the cause is a direct result of a failure on Mr. Kilpatrick's part to do his job properly" establishes direct evidence of age discrimination.  (Doc. # 22 at 33).  To paraphrase Judge Carnes, if arguments had legs, this one would get up and run away.  *Baldwin v. Blue Cross Blue Shield of Ala.*, 480 F.3d 1287, 1308 (11th Cir. 2007).  This is because the argument simply misunderstands what direct evidence is.  The Eleventh Circuit recently defined "direct evidence" as follows:

> "Direct evidence" of age or disability-based discrimination is "evidence, which if believed, proves existence of fact in issue without inference or presumption . . . . Evidence that only suggests discrimination, . . . or that is subject to more than one interpretation, . . . does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (listing cases where direct evidence was proffered) (citations omitted); *cf. Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005) (citing *Wright* [*v. Southland Corp.*, 187 F.3d 1287, 1294 (11th Cir. 1999)] and explaining that direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption").  "Only the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir. 1989).  In an age discrimination context, "the quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley–he is too old.'" *Merritt*, 120 F.3d at 1190 (quoting *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).

*Roberts v. Design & Mfg. Services, Inc.*, 167 F. App'x 82, 84–85 (11th Cir. 2006).  Plaintiff has not presented any direct evidence under Eleventh Circuit's definition.  It is undisputed that Plaintiff never

once heard any member of Tyson management say anything that could be characterized as discriminatory regarding age.  (Doc. # 17 Ex. A at 268–69).  Additionally, it is undisputed that Plaintiff never heard any discriminatory remark regarding age from either Martin or Pearce, the decision-makers who Plaintiff complains of in this case.  (*Id.*).  What Plaintiff does allege is that Martin's "beliefs" regarding Plaintiff's performance (as described above) are direct evidence; however, those "beliefs" require the court, at the very least, to make a colossal inferential leap involving several intermediate steps before it could determine that Martin had any discriminatory animus.  Thus, the court finds that Plaintiff has failed to put forth *any* direct evidence from which a reasonable factfinder could conclude that Tyson's management discriminated against him on the basis of age.

**B.**    **Although Plaintiff Has Established a *Prima Facie* Case of Age Discrimination, He Cannot Show Pretext**

For cases arising under the ADEA, the Eleventh Circuit has adopted a variation of the *prima facie* case standard articulated for Title VII claims by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (as modified by *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *Desert Palace v. Costa*, 539 U.S. 90 (2003)).[7]  *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir.1992).  "Under this variation of the *McDonnell Douglas* test for

---

[7]Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden of production, the plaintiff must either present substantial evidence which shows (1) that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* (2) a reasonable jury could conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253–54; *Desert Palace*, 539 U.S. at 99–102.

establishing a prima facie case of discrimination, the plaintiff must show that he (1) was a member of the protected group of persons between the ages of 40 and 70, (2) was subject to adverse employment action, (3) was replaced with a person outside the protected group [or others outside the protected class were treated more favorably than plaintiff], and (4) was qualified to do the job." *Id.* (citing *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064 (1990)). Here, there is no dispute that Plaintiff was in the protected age group and that he suffered an adverse employment action. Defendant briefly questions whether or not Plaintiff was "qualified to do the job" in a footnote in its brief, but seems to assume this element of Plaintiff's *prima facie* case for the purposes of summary judgment.[8] Furthermore, Defendant admits that Plaintiff was replaced by Dalrymple, a 52 year old male, who (Defendant is quick to point out) is "also in the protected age group," such that, according to Defendant, Dalrymple is "hardly the age of an individual you hire because you harbor a discriminatory animus against older workers." (Doc. # 15 at 20). To the extent that Defendant argues that because Plaintiff's replacement in this case is also part of "the protected group" he is thereby foreclosed from establishing a *prima facie* case, that argument holds no water. As the Supreme Court has held:

> [The ADEA] does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*.

---

[8]In this circuit, evidence that the plaintiff has performed his responsibilities for several years without complaint allows the fact finder to draw the inference that he was qualified for the job. *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1520 (11th Cir. 1990) (citing *Stanfield v. Answering Serv. Inc.*, 867 F.2d 1290, 1293–94 (11th Cir. 1989). It is undisputed that Plaintiff served in the position of dispatcher at the Tyson Albertville mill for over twenty-seven years at the time of his termination. As recently as 2003, Plaintiff was rated as a "Good Performer." Therefore, the court concludes that Plaintiff can show he was qualified for the dispatcher position.

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (emphasis in original).

Thus, the fact that Plaintiff, who was 68 years old at the time of his termination, was replaced by a

52 year old, who is also in the ADEA's protected group, is of no moment.  There is little question

that Dalrymple (age 52) is "substantially younger" than Plaintiff (age 68), for the purpose of

assessing Plaintiff's *prima facie* case.[9]  Therefore, Plaintiff has established a *prima facie* case of age

discrimination under the ADEA.

Once a plaintiff establishes a *prima facie* case under *McDonnell Douglas*, the employer must

articulate a legitimate, non-discriminatory rationale for the discharge.  *Young v. Gen. Foods Corp.*,

840 F.2d 825, 828 (11th Cir. 1988).  Here, Tyson has cited several instances of Plaintiff's poor job

performance and continued counseling without improvement, which culminated in his termination.

Having articulated a legitimate reason for Plaintiff's dismissal, the burden now shifts back to Plaintiff

to prove that his employer's asserted reason is a pretext for age discrimination.  *See id.* (citing

*Anderson v. Savage Labs., Inc.*, 675 F.2d 1221, 1224 (11th Cir. 1982)).

Attempting to show pretext, Plaintiff asserts that (1) he was consistently a good performer

on the job, (2) any shortcomings in his performance were due to the new management's unrealistic

expectations for the feed delivery system, or (3) that he did not have adequate resources to perform

his job up to these new standards.  However, none of these allegations, even if true, establishes that

Defendant's non-discriminatory reasons for Plaintiff's termination are mere pretext *for age

discrimination*.   First, even if Plaintiff disagrees with Defendant's evaluation of his work

performance, this disagreement does not establish pretext.  A plaintiff cannot demonstrate pretext

---

[9]Plaintiff has not set forth any allegations whatsoever that younger employees that were
"similarly-situated" to Plaintiff were treated more favorably than him.

"by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision without any additional evidence (over and above that of the prima facie case) of age discrimination." *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 747 (10th Cir. 1991); *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 345–46 (6th Cir. 2006) (affirming summary judgment and finding that Honda presented evidence that the plaintiff was terminated because of poor performance demonstrated by ratings and counseling, and that although the plaintiff disputed Honda's evaluation of his performance, he did not present evidence to undermine Honda's evidence that it based its judgment regarding his poor performance on the particularized facts before it). Moreover, Plaintiff's own opinion about his qualifications is irrelevant to this analysis. *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citations omitted) ("where the employer produces performance reviews and other documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence"); *see also Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) ("[I]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance"). With the foregoing standards in mind, Plaintiff has put forth no evidence to convince this court that Tyson did not hold a good faith belief that he was a substandard employee and that this—not discriminatory animus—was the reason for his termination.[10]

---

[10]It is worth noting again that Plaintiff never heard any remarks displaying age animus by anyone at Tyson. (Doc. # 17 Ex. A at 268–69).

Plaintiff argues that he did not have adequate resources to perform his job.  Not only is this argument unsupported by the record evidence, it also fails to suggest any age discrimination.  Since taking over as feed mill dispatcher, Dalrymple has performed the same job duties required of Plaintiff without any of the additional resources (with the possible exception of additional delivery drivers) requested by Plaintiff.  (Doc. # 18 Ex. B at 76; Doc. # 19 Ex. D ¶ 14).  Moreover, even if Plaintiff's assertion were true, this does not establish pretext, as Plaintiff cannot show that Tyson did not in good faith believe that he had the resources necessary to perform his job duties, and that his job performance and refusal to improve that performance justified termination.  The law is clear that an honest belief in an employee's poor performance (even if incorrect) provides no basis for a discrimination claim:

> [I]f an employer discharges an individual under the honest belief pursuant to information available to the employer that the employee has violated a policy of the employer, the fact that the employer's belief may be mistaken or wrong in fact does not mean that such belief cannot constitute a legitimate reason for the employer's discharge of the plaintiff.

*Smith v. Papp Clinic, P.A.*, 808 F. 2d 1449, 1452  (11th Cir. 1987); *see also Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (citation omitted) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision")*; Clark v. Coats & Clark, Inc.*, 990 F. 2d 1217, 1228 (11th Cir. 1993) ("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate nondiscriminatory reason for termination"); *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (finding that "for an employer to prevail the jury need not determine

that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory. . . ."). Plaintiff cannot present any evidence that those people making the ultimate decision to terminate his employment—Martin, Pearce, Allen Trotter, and Jerry Tilton—held anything other than a good faith belief that Plaintiff's job performance was lacking and did not improve despite numerous corrective actions. Even though Plaintiff insists that he could not perform his job functions without additional resources, it is undisputed that Plaintiff continued to fail to respond to requests and directives from his supervisor. (*Id.* at 179, 210–12). He was allowed to go to another plant to observe and receive training regarding the FOD. (Doc. # 17 Ex. A at 135). He had received two written serious counselings and was suspended twice for his poor job performance in the last six months of his employment. (*Id.* at Exs. 20 & 28). He was told by three different supervisors that his performance was inadequate and needed to improve. Finally, Plaintiff failed to develop a written action plan addressing how he planned to resolve Tyson's concerns, but rather shifted blame to others and suggested more personnel be hired to perform his job duties. (*Id.* at Ex. 30). Therefore, Plaintiff cannot show that Defendant's legitimate, non-discriminatory reason for his discharge—poor job performance—is mere pretext for age discrimination, and he cannot sustain his claims under the *McDonnell Douglas* framework.

**C.    Plaintiff's Statistical Evidence Is Insufficient to Establish an Inference of Age Discrimination**

Finally, Plaintiff claims that he has established a "pattern of age discrimination" through statistical evidence. (Doc. # 22 at 41). Namely, Plaintiff cites the following statistics as grounds for a finding of discrimination, submitting Tyson's own records as supporting evidence: (1) fourteen

23

of the thirty-five people who terminated from the Albertville mill from 2001 to 2006 were forty years of age or over;  (2) in 2001, five of the eighteen people who terminated from the three mills, Ivalee, Talladega, and Albertville, were forty years of age or over; (3) in 2002, thirteen of the twenty-four people who terminated from the three mills were forty years of age or over; (4) in 2003, seven of the nineteen people who terminated from the three mills were forty years of age or over; (5) in 2004, eight of the sixteen people who terminated from the three mills were forty years of age or over; (6) in 2005, twelve of the thirty-one people who terminated from the three mills were forty years of age or over; (7) in 2006, seventeen of the forty-five people who terminated from the three mills were forty years of age or over; (8) in 2005, two of the six people at the three mills who received Written Warning/Suspension and/or Counseling Statements were forty years of age or over; and (9) in 2006, thirteen of the twenty people at the three mills who received Written Warning/Suspension and/or Counseling Statements were forty years of age or over.  (Doc. # 22 Exs. G, H & I).

Citing to this evidence, Plaintiff claims that "terminations" of employees over the age of 40 have increased over a period of time at Tyson.  However, by including both voluntary (*i.e.*, retirements, job abandonment, and/or resignations) and involuntary terminations, there is no way to determine whether these figures are misleading and inaccurate.  But in any event one thing is clear: they do not, in and of themselves, establish any evidence of age discrimination.  The evidence simply is not set within any analytical framework by which to substantiate the proffered conclusions.  Courts agree that in order for statistics to be relevant, a plaintiff must do more than produce "raw figures" to establish any statistically significant trend regarding employment decisions.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004); *Evans v. McClain, Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) (rejecting plaintiff's anecdotal evidence that, despite employing 650 employees in

eight plants, employer had only three black supervisory employees); *Langston v. Carraway Methodist Hosps. of Ala.*, 840 F. Supp. 854, 863 (N.D. Ala. 1993) ("Such raw figures are seldom useful because they provide no framework for analysis. 'Statistics . . . without an analytic foundation, are virtually meaningless.'") (citing *Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946, 952 (11th Cir. 1991)).

Even taking Plaintiff's numbers as valid on their face (*i.e.*, putting aside issues such as whether the numbers include voluntary terminations, which obviously have no bearing on whether Tyson *fires* workers because of their age), Plaintiff's statistical conclusions do not support any reasonable inference of age discrimination. By simply crunching the numbers on terminations at the Albertville mill from 2001 to 2006, while the number of overall terminations increased, the percentage of employees age 40 or older whose employment ended (either voluntarily or involuntarily) in 2005 and 2006[11] actually decreased from 2004. Therefore, as Plaintiff has "failed to place any of the statistical data within a relevant framework or to present evidence allowing this court to construct the framework in which the evidence proffered by appellant would be relevant,"[12]

_____

[11]This is the time period that Martin and Pearce—the alleged discriminators in this case—were supervisors at the Albertville mill.

[12]A plaintiff in an age discrimination case usually submits statistical evidence in order to establish a nexus between age discrimination and the adverse employment action. *See Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1388 (11th Cir. 1983). In those situations, statistical proof or other "evidence of a pattern of terminating older workers . . . allow[s] the reasonable inference that age had played a role in appellant's discharge." *McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980) (In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981); *see also Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818 (5th Cir. 1972); *Moore v. Sears, Roebuck & Co.*, 464 F. Supp. 357 (N.D. Ga. 1979). If a plaintiff seeks to rely on proof of a pattern of discrimination to satisfy this pertinent element of a *prima facie* case, he has the burden of presenting such statistical evidence that will, in conjunction with the other elements, give rise to an inference of discrimination.

and because the data as presented does not reveal a pattern or practice of discrimination, the court finds that Plaintiff has failed to submit statistical data that shows a pattern of age discrimination. *Pace v. S. Ry. Sys.*, 701 F.2d 1383, 1389 (11th Cir. 1983).

## V.    CONCLUSION

For the reasons set forth above, the court concludes that Defendant Tyson Foods Inc.'s Motion for Summary Judgment is due to be granted, and all of Plaintiff's claims against Defendant should be dismissed.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this _____23rd_____ day of July, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

*Pace*, 701 F.2d at 1388.

26